## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

RACHEL DAWSON,

Case No.

        Plaintiff,

Hon.

v.

BOARD OF REGENTS OF
THE UNIVERSITY OF MICHIGAN,

        Defendant.

---

Amanda M. Ghannam (P83065)
Schulz Ghannam PLLC
645 Griswold St., Suite 4100
Detroit, MI 48226
(313) 788-7446
amanda@michiganworkerlaw.com
Counsel for Plaintiff

---

### PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff, Rachel Dawson, through counsel, brings this complaint against Defendant Board of Regents of the University of Michigan as follows:

### INTRODUCTION

This lawsuit arises out of the retaliatory and discriminatory termination of Rachel Dawson, J.D., a former employee of the University of Michigan. Ms. Dawson, a Black woman, attended a conference in March of 2024 during which she

1

was approached and engaged in a private conversation by two non-Black women who accused the University of fostering an antisemitic environment. When Ms. Dawson disagreed with them and shared her personal opinion that the University had made great efforts to combat antisemitism as well as other types of bias, they became visibly angry and asked her if she knew the history of the Israeli-Palestinian conflict and if she believed Palestinian people have a right to live in the region. She responded that she did. The two women falsely accused her of making antisemitic comments and complained to the University, which deviated from its typical disciplinary procedures and engaged a third-party investigator. After the investigation, the University issued Ms. Dawson a written warning. However, after learning of the outcome, Regent Mark Bernstein wrote to then-president Santa Ono that he was "disgusted" and that "the only acceptable outcome would be for Ms. Dawson to be terminated immediately." The University abruptly changed course, revoked the written warning, held a sham disciplinary review conference, and terminated Ms. Dawson's employment, disregarding Ms. Dawson's complaints about bias in the process. Ms. Dawson now brings suit for violations of Title VI and Title VII of the Civil Rights Act of 1964, as amended. She intends to simultaneously file suit in the Michigan Court of Claims alleging violations of her constitutional rights to free speech and due process, as provided by relevant law.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff, Rachel Dawson, J.D., is a lawyer, educator, parent, and community member in Ann Arbor, Michigan, and a former employee of the University of Michigan.

2.      Defendant, the Board of Regents of the University of Michigan, is the corporate body responsible for managing the University of Michigan's affairs and property and the body capable of suing and being sued on the University of Michigan's behalf pursuant to M.C.L. §390.641.

3.      This Court has general federal question jurisdiction pursuant to 28 U.S.C. §1331, Title VI of the Civil Rights Act of 1964, and Title VII of the Civil Rights Act of 1964, as amended.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(e) because the events giving rise to this complaint occurred in the Eastern District of Michigan, Plaintiff resides within the Eastern District of Michigan, and Defendant resides within the Eastern District of Michigan.

5.      Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission and received her notice of right to sue on April 16, 2025.

## STATEMENT OF FACTS

6.     Plaintiff, Rachel Dawson, began her employment at the University of Michigan in 2017.

7.     Ms. Dawson is a Black/African-American woman.

8.     Ms. Dawson's most recent position with the University of Michigan was Director of the Office of Academic Multicultural Initiatives.

9.     Ms. Dawson always performed her job duties excellently and received positive performance reviews.

10.     She received commendations from students and faculty alike who praised her ability to address complex issues and support students from various backgrounds.

11.     In March of 2024, Ms. Dawson attended a conference held by the American Association of Colleges and Universities.

12.     Ms. Dawson did not participate as a speaker at the conference, nor did she serve on any panels or represent the university in any capacity.

13.     While at the conference, Ms. Dawson had many casual conversations with other attendees about various topics.

14.     After one panel discussion, two other conference attendees, Professor Naomi Yavneh Klos and another woman, both of whom were white/Caucasian, approached Ms. Dawson and, knowing that she was a University of Michigan

4

employee, began to ask her questions about a rumor they had heard regarding antisemitism on campus.

15.     Ms. Dawson shared her personal opinion that the school was doing its best to navigate complex issues and combat antisemitism as well as other types of prejudice on campus. She said that she didn't think the entire school was anti-Semitic.

16.     For example, Ms. Dawson noted that the University had recently opened the Raoul Wallenberg Institute as part of its efforts to combat antisemitism, and that Jewish students had access to supportive organizations such as Hillel.

17.     She shared her personal opinion that the University had taken significant steps to navigate complex issues and support students of all backgrounds, and that if the two women spoke to more students, they might hear other perspectives.

18.     Ms. Dawson engaged in this conversation in the capacity of a private individual. At no point did she purport to speak on behalf of the University of Michigan.

19.     Ms. Klos and the other woman became angry with Ms. Dawson when she did not simply agree with their pre-conceived belief that the University of Michigan allowed antisemitism to flourish freely on campus.

20.     They began to berate her and pepper her with unrelated questions, such as whether she understood the history of the Israeli/Palestinian conflict.

21.     Ms. Dawson responded that she did, and that she had recently read a scholarly article which stated that both Jewish and Palestinian people had ancient origins in the region.

22.     This angered the two women further. They asked Ms. Dawson, "Are you saying Palestinians have a right to the land?" Ms. Dawson responded that she believed that both Israelis and Palestinians had equal rights to live in the region and were not being served well by their political leaders.

23.     This apparently infuriated the two women. They were so angry that they followed Ms. Dawson out of the room and refused to let her exit the conversation.

24.     Ms. Dawson left the encounter feeling shaken up by the two women's hostility.

25.     After the conference, Ms. Dawson returned to Ann Arbor and got back to work. Though the encounter had been strange, it had nothing to do with her day-to-day job duties at the University, which she continued to perform excellently.

26.     Months later, in September of 2024, Ms. Dawson learned that her employer was investigating her private speech at the conference.

27.    The two women had reported Ms. Dawson to a third-party organization, the Anti-Defamation League ("ADL"), and the ADL had contacted then-University president Santa J. Ono.

28.    The two women reported numerous falsehoods, which the ADL then conveyed to the University. They falsely claimed Ms. Dawson had made comments to the effect of "We don't work with Jews. They are wealthy and privileged and take care of themselves"; "The University is controlled by wealthy Jews"; and "The rich donors and Jewish board members control the president and silence the MENA students".

29.    Ms. Dawson had not actually made any of those comments.

30.    Bypassing all usual disciplinary procedures and apparently disregarding the potential for a conflict of interest to arise, the University of Michigan hired the law firm of Covington & Burling LLP, which also represents the ADL, to investigate Ms. Dawson.

31.    Covington & Burling interviewed Ms. Yavneh Klos, the other anonymous participant in the conversation, and Ms. Dawson.

32.    During her interview, Ms. Dawson clarified that she had "noted that the University prided itself on being a safe haven for Jewish faculty and students historically"; "said that she acknowledged that students might be experiencing antisemitism on campus, but noted that there was also anti-Muslim, anti-Asian, and

anti-Black sentiment at the University and that the University was concerned about each"; and "unequivocally denied making each of the statements" alleged in the ADL letter.

33.     Despite acknowledging that "it is not possible to determine with certainty whether Ms. Dawson made the exact remarks attributed to her in the ADL Michigan letter," and "it is likely that the actual substance of the conversation fell somewhere between the descriptions provided by Professor Yavneh Klos and Professor A on the one hand, and by Ms. Dawson on the other", the Covington & Burling report concluded that "the weight of the available evidence supports the conclusion that Ms. Dawson made the statements attributed to her in the ADL Michigan letter."

34.     After reading the report, Ms. Dawson's supervisor, Tabbye Chavous, Vice Provost for Equity & Inclusion and Chief Diversity Officer, sent then-President Ono a letter expressing her concerns with the Covington & Burling report's conclusions and investigation.

35.     Ms. Chavous's letter stated:

*Based on all information available to me, I would respectfully disagree with the conclusion drawn from the report [that Ms. Dawson made the statements attributed] ... Instead, the information available to me (from the report and my own observations/interactions) warrants a conclusion that, at most, the*

*conversation in question did occur and that the individuals interviewed discussed the specific topics described. The evidence provided in the report does NOT support a conclusion clearly favoring any party's version of events…*

*I have several concerns regarding the investigation as well. First, I have concerns regarding the overall process that led to the outside investigation. Second, I have concerns and questions regarding how the investigation was conducted and, more importantly, the basis for the conclusions drawn…*

*It is obvious that this is not consistent with our normal processes for investigating alleged similar conduct of employees in a similar position as Ms. Dawson at an off-campus conference. Why is the process for this situation and employee seemingly different from similar kinds of allegations and issues with others and how they are dealt with normally? That is, this type of investigation seems unprecedented for an employee at this level… It is my understanding that similar instances in the past were handled by HR and then ultimately the employee's unit and supervisor. This raises questions about equity in process and how we (the university) are treating and responding to different topics and people. …*

*In addition, I remain unclear as to what specific HR violations are being investigated… it is unclear what specific allegations actually violate our HR*

*rules and regulations. There is no evidence in the report that indicates that Ms. Dawson has discriminated against any of our students… Also, given that the conversation was a private one that was initiated by the accusers and was not in her work capacity, it is difficult to understand on what basis we have the authority to regulate the employee's speech…*

*The reality is that the evidence provided by the report boils down to competing "she say-she say" narratives with no credible way to determine which account is most accurate. As such, it is impossible to come to any firm conclusions (much less conclusions that warrant negatively affecting a person's career or reputation). Thus, I am troubled by the fact that the report seems to weigh certain perspectives over others based on weak, arbitrary, and unscientific rationales. For instance, the report frames one set of accounts/motivations (the witnesses') as more credible in terms of motivation to distort. It is well known (for instance, the phenomenon of motivated memory) that people can experience the same event in different ways based on their prior conceptualizations. This is particularly likely under the conditions of high emotion, which seemed to be the case for Professor Klos, based on the way she approached Ms. Dawson, and perhaps for Professor A, who was reportedly motivated to develop a log after the conversation… Thus, while there is not information provided indicating that the witnesses had motivation*

*to intentionally fabricate details (and I have no reason to think this is the case either), it is possible that confirmation bias was at play - i.e., that the messages Professors Klos and A heard, came away with, and conveyed to others were salient to the feelings they already had about the issues. Witness accounts and recall, even those occurring right after an event, can be notoriously unreliable and subject to recall bias. (This exact point was made by VP Lynch even recently in one of our President's Leadership Team meetings, when discussing recent campus events). It is also a well-established phenomenon in the social psychology literature.*

*Finally, although my knowledge of and experience with Ms. Dawson has not been that long (less than a year in her current position as OAMI director), what I have observed in her job performance is consistent with a person who cares for ALL students. And to my knowledge there have been no complaints from any student, faculty, or staff about OAMI not welcoming or providing services to students from any group, and no other allegations against Ms. Dawson specifically about her not providing student support or resources as a function of background or identity.*

36.    Ms. Dawson's supervisor issued her a written warning in October 2024 requiring her to complete a leadership training and an anti-bias training.

37.     According to emails obtained by the New York Times, "Jon Kinsey, a university vice president, wrote to the regents on behalf of the president's office to inform them that Ms. Dawson had been issued a written warning that additional incidents could result in termination, and that she would have to do training in antisemitism and leadership."[1]

38.     "The next day, Mark Bernstein, a regent, wrote to campus officials, including the president, Santa Ono, saying that he was "disgusted" with the university's response, according to the emails."[2]

39.     "Mr. Bernstein wrote that the only acceptable outcome would be for Ms. Dawson to be "terminated immediately.""[3]

40.     Days later, on November 1, Ms. Dawson was placed on leave and told by Provost Laurie McCauley and Human Resources that her supervisor's warning letter was being revoked and that university leadership had decided to move forward with disciplinary action that could lead to termination.

41.     She was also told that her conduct during an August 28 student protest was a factor in the decision.

---

[1] https://www.nytimes.com/2024/12/12/us/university-of-michigan-dei-administrator-antisemitism.html
[2] Id.
[3] Id.

42.     This alleged conduct involved Ms. Dawson acting as a liaison between student protestors and University police and advocating for student protestors not to be violently arrested.

43.     Multiple faculty members and students had in fact thanked Ms. Dawson for the way she advocated for students to be kept safe.

44.     Ms. Dawson asked who specifically was making these decisions that were outside the University's typical disciplinary processes.

45.     Ms. McCauley refused to provide any additional information, claiming that she was "not at liberty" to tell Ms. Dawson who the decision-makers were.

46.     Ms. Dawson told Ms. McCauley and the HR employee that she felt her employment rights were being violated.

47.     The University held a disciplinary review conference on December 6, 2024.

48.     Ms. Dawson's supervisor refused to participate in the conference due to her disagreement with the way the University handled the issue.

49.     Prior to the disciplinary review conference, Ms. Dawson submitted a written statement expressing her concerns about discrimination and bias in the University's actions towards her.

50.     The statement read in relevant part:

*The University's characterization of my conduct as "aggressive" and "abusive" reflects negative stereotypes about Black women, and I am concerned that discrimination and bias may have informed the University's response and decision to not only discipline me, but escalate my discipline from a written warning to a DRC. I am aware of several non-Black employees of the University who have been the subject of similar complaints about their behavior, and none have been terminated…*

*The allegations against me illustrate how racial and gender biases can shape the interpretation of events and statements, especially for Black woman in positions of authority. Historically, Black women have been subjected to stereotypes that portray them as confrontational or untrustworthy. The accusations here rely heavily on uncorroborated accounts and exhibit significant discrepancies. These factors, coupled with the broader societal lens through which Black women's words and actions are often magnified or misrepresented, reflect underlying biases… Professor Klos's notes say "She is talking to me as a Black woman. She can't say this to me." This reflects a disturbing bias. Clearly, Professor Klos believed that I, as a Black woman, should "know my place" and had no right to disagree with her.*

51.     Ms. Dawson's statement also reiterated her concerns about deviations from and contraventions of university protocols and policies, as well as potential violations of her constitutional rights.

52.     At the disciplinary review conference, Provost McCauley and her Human Resources liaison, Linda Dombrowski, claimed that the University was "contemplating termination."

53.     The University informed Ms. Dawson that her employment had been terminated on December 10, 2024.

54.     On information and belief, employees of the University of Michigan who are not Black women have engaged in similar or more serious conduct as that which Ms. Dawson was accused of and were not terminated.

55.     For example, at least one non-Black employee of the University engaged in significantly more egregious behavior on campus including calling students "terrorists", "rapists," and "murderers"[4], but instead of firing that person, the University hired an "executive coach" for her.

## COUNT I
## Violation of Title VI of the Civil Rights Act of 1964

56.     Plaintiff incorporates the preceding allegations as if fully restated herein.

---

[4] https://www.michigandaily.com/news/academics/school-of-information-will-not-punish-board-member-who-verbally-assaulted-arab-and-muslim-students/

57.     Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

58.     As a public university, Defendant Board of Regents of the University of Michigan received and continues to receive federal financial assistance.

59.     Defendant subjected Plaintiff to intentional discrimination, excluded her from participation in, and denied her the benefits offered by the University of Michigan by its conduct described herein, including but not limited to terminating Plaintiff's employment with the University of Michigan.

**COUNT II**
**Discrimination in Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. §2000e-2(a)(1); §2000e-2(m)**

60.     Plaintiff incorporates the preceding allegations as if fully restated herein.

61.     At all relevant times, Defendant was an employer with greater than 15 employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

62.     Plaintiff is a member of protected groups under Title VII due to her race (Black/African-American) and sex/gender (female).

63.     Defendant discriminated against Plaintiff because of her race and sex/gender in the terms and conditions of her employment in violation of 42 U.S.C. §2000e-2(a)(1).

64.     Defendant subjected Plaintiff to adverse employment actions described herein, including but not limited to terminating her employment.

65.     But for Plaintiff's race and sex/gender, Defendant would not have subjected Plaintiff to such adverse employment actions.

66.     Defendant's actions were motivated by unlawful discrimination against Plaintiff because of her race and sex/gender, even though other factors may have motivated Defendant's actions, in violation of 42 U.S.C. §2000e-2-(m).

67.     Defendant's course of conduct was done with reckless disregard for Plaintiff's federally protected civil rights, entitling Plaintiff to punitive damages.

### COUNT III
### Retaliation in Violation of Title VII of the Civil Rights Act
### 42 U.S.C. §2000e-3(a)

68.     Plaintiff incorporates the preceding allegations as if fully restated herein.

69.     At all relevant times, Defendant was an employer with greater than 15 employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

70.     Plaintiff engaged in activity protected by Title VII including but not limited to opposing discrimination in the terms and conditions of her employment as described herein.

71.     Defendant subjected Plaintiff to adverse employment actions described herein, including but not limited to terminating her employment.

72.     Defendant's actions were motivated by unlawful retaliation towards Plaintiff because of her protected activity in violation of 42 U.S.C. §2000e-3(a).

73.     But for Plaintiff's protected activity, Defendant would not have subjected Plaintiff to such adverse actions.

74.     Defendant's course of conduct was done with reckless disregard for Plaintiff's federally protected civil rights, entitling Plaintiff to punitive damages.

## DAMAGES

75.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages, including but not limited to loss of income and earning capacity, impairment of her ability to work, emotional and physical distress, loss of reputation, humiliation and embarrassment, and will continue to suffer such damages in the future.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## RELIEF REQUESTED

Wherefore, Plaintiff Rachel Dawson respectfully requests this Honorable Court grant the following relief:

- Find that Defendant discriminated and/or retaliated against Plaintiff in violation of Title VI of the Civil Rights Act of 1964 and Title VII of the Civil Rights Act of 1964;

- Award Plaintiff compensatory damages;

- Award Plaintiff punitive damages;

- Award Plaintiff reasonable attorneys' fees and costs; and

- Grant Plaintiff such other relief as this Court deems just and proper.

Respectfully submitted,

By: /s/ Amanda M. Ghannam

Amanda M. Ghannam (P83065)
Schulz Ghannam PLLC
645 Griswold St., Suite 4100
Detroit, MI 48226
(313) 788-7446
amanda@michiganworkerlaw.com
Counsel for Plaintiff

Dated: July 14, 2025