UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RACHEL DAWSON,

Plaintiff,

v.

BOARD OF REGENTS OF
UNIVERSITY OF MICHIGAN,

Defendant.

Case No. 25-cv-12123
Honorable Shalina D. Kumar
Magistrate Judge Curtis Ivy, Jr.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (ECF NO. 17)

### I.   Introduction

Plaintiff Rachel Dawson ("Dawson") sues defendant Board of

Regents of the University of Michigan (the "University"), her former

employer, for racial and gender discrimination and retaliation in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title

VII").[1] ECF Nos. 1, 15. The University moves to dismiss Dawson's first

amended complaint (FAC). ECF No. 17. That motion is fully briefed, ECF

---

[1] Dawson also asserted a claim against the University under Title VI of the
Civil Rights Act, 42 U.S.C. § 2000d *et seq.*, but agreed to the dismissal of
this claim in her response brief opposing the motion to dismiss. ECF No.
19, PageID.245.

Page **1** of **20**

Nos. 17, 19, 20, and the Court heard oral argument from the parties on July 15, 2026. For the reasons discussed below, the Court grants the University's motion to dismiss.

## II.      Procedural and Factual Background

According to the allegations in the FAC, Dawson, a Black woman, began her employment with the University in 2017. ECF No. 15, PageID.120. Dawson held the position of Director of the Office of Academic Multicultural Initiatives ("OAMI") when she attended a conference held by the American Association of Colleges and Universities in March 2024. *Id*. According to Dawson, she did not participate as a speaker or a panelist at the conference, and did not "represent the university in any capacity." *Id*. at ¶ 13.

While at the conference, Dawson was approached by two other attendees, both white women, who asked her about antisemitism on the University's campus in the wake of the October 2023 Hamas attack on Israel. *Id*. at PageID.121. Dawson claims that she responded by defending the University's efforts to "navigate complex issues and combat antisemitism as well as other types of prejudice on campus." *Id*. at ¶ 16. She also asserts that she offered her personal opinions as an individual, not as a

representative of the University. *Id*. at PageID.122. Dawson alleges that the women became antagonistic toward her when she did not agree with their belief that the University "allowed antisemitism to flourish freely on campus." *Id*. at ¶ 20. She asserts they followed her from the room and rebuffed her attempts to exit the conversation, and that the women's hostility left her shaken. *Id*. at ¶ ¶ 24–25.

In September 2024, Dawson learned that the University was investigating her encounter with the women at the conference. *Id*. at PageID.123. The women had reported to the Anit-Defamation League ("ADL") that "Dawson had made comments to the effect of "We don't work with Jews. They are wealthy and privileged and take care of themselves;" "The University is controlled by wealthy Jews;" and "The rich donors and Jewish board members control the president and silence the MENA [Middle Eastern North African] students." *Id*. at ¶ 29. The ADL contacted then-University president Santa Ono regarding the reported comments. *Id*. at ¶ 28. Dawson denies making any of these comments. *Id*. at ¶ 30.

The University hired an outside law firm to investigate the March 2024 incident. *Id*. at ¶ 31. The law firm interviewed Professor Naomi Yavneh Klos ("Professor Klos") and the other anonymous participant in the subject

conversation with Dawson at the conference, as well as Dawson. *Id*. at PageID.124. During her interview, Dawson unequivocally denied making each of the statements alleged in the ADL complaint and "noted that the University prided itself on being a safe haven for Jewish faculty and students historically" and "that the University was concerned about" antisemitism and other racial, religious, and ethnic bias on campus. *Id*. at ¶ 33.

The outside law firm, which Dawson notes also represents the ADL, "concluded that 'the weight of the available evidence supports the conclusion that Ms. Dawson made the statements attributed to her'" by the ADL, "[d]espite acknowledging that 'it is not possible to determine with certainty whether Ms. Dawson made the exact remarks attributed to her [by the ADL]' and 'it is likely that the actual substance of the conversation fell somewhere between the descriptions provided by Professor Yavneh Klos and [anonymous participant] on the one hand, and by Ms. Dawson on the other.'" *Id*. at ¶ ¶ 31, 34. As a result of the report, in October 2024 Dawson's supervisor issued her a written warning that additional incidents could result in termination and that required her to complete trainings in both antisemitism and leadership. *Id*. at PageID.128, ¶ ¶ 37–38.

According to Dawson and as was reported by the New York Times, a University vice president, on behalf of the president's office, wrote to the regents to inform them that Dawson had been issued a written warning that required her to attend trainings and that further incidents could result in termination. *Id*. at ¶ 38 (citing

https://www.nytimes.com/2024/12/12/us/university-of-michigan-dei-administratorantisemitism.html). According to that article, as Dawson alleges, one regent wrote to campus officials, including the University president, to say he was "disgusted" with the University's response and "that the only acceptable outcome" was immediate termination. *Id*. at ¶ ¶ 38–39.

Days later, the Provost and Vice President for Academic Affairs (the "provost") placed Dawson on leave. *Id*. at PageID.129, ¶ 41. She told Dawson that her warning letter was being revoked and University leadership had decided to move forward with disciplinary action that could include termination. *Id.* The provost explained this was a result of Dawson's March 2024 comments and her involvement in an August 2024 student protest, at which she served as liaison between student protestors and University police. *Id*. at ¶ ¶ 41–42. Dawson complained that this decision

Page **5** of **20**

was outside the University's typical disciplinary process and that "she felt her employment rights were being violated." *Id*. at ¶ ¶ 45, 47.

The University held a disciplinary review conference ("DRC") on December 6, 2024. Dawson's supervisor, who had earlier written a letter to the president challenging the University's outsourcing of the investigation and the validity of the investigation's conclusion, refused to participate in the DRC in protest of the University's actions against Dawson. *See id*. at PageID.124–28; *id*. at PageID.130, ¶ 49. Prior to the DRC, Dawson submitted a written statement expressing her concerns that the University's actions were "informed" by racial and gender biases. *Id*. at ¶ 51. She noted that the characterization of her conduct as "aggressive" and "abusive" reflected "negative stereotypes about Black women." *Id*. Dawson suggests that the University accepted an investigative conclusion based on uncorroborated accusations because those accusations were viewed through the stereotypical lens of Black women as "confrontational or untrustworthy." *Id*. at PageID.131. Four days after the disciplinary hearing, the provost informed Dawson that the University had terminated her employment. *Id*. at ¶ 54.

Dawson's pre-hearing statement also documented that she was aware of several non-Black employees of the University who had been the subject of "similar complaints" but not terminated. *Id*. at PageID.130. She offers specific examples in the FAC: a non-Black member of the University community called Arab and Muslim students "terrorists," "rapists," and "murderers," but the provost did not punish her; a white male urology professor accused of berating, harassing, and discriminating against a female Egyptian colleague and researcher was not terminated; multiple male professors, and other employees outside of Dawson's protected class(es) were not disciplined or terminated after making comments perceived as offensive about the death of Charlie Kirk; white University employees reporting to the same provost as Dawson were neither disciplined nor terminated after being accused of making racist comments in social media posts and to subordinates; and a white University employee engaging in similar conduct as Dawson at the August 2024 student protest was not disciplined or terminated. *Id*. at PageID.132–34, ¶ ¶ 57–65.

The FAC asserts that the University discriminated against Dawson because of her race and gender, and but for her race and/or gender the University would not have imposed the adverse employment actions they

took against her, including termination. *Id*. at PageID.137, ¶ ¶ 78–80. It also

alleges that Dawson engaged in activity protected by Title VII by opposing

the University's adverse employment actions against her, and that but for

retaliation for her protected activity, the University would not have

terminated her employment. *Id*. at PageID.138, ¶ ¶ 86–88.

## III. Analysis

### A. Standard of Review

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief

that is plausible on its face." *Golf Village N., LLC v. City of Powell*, 14 F.4th

611, 617 (6th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal

marks omitted). A claim is plausible on its face if the factual allegations in

the complaint "allow the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678

(citing *Twombly*, 550 U.S. at 556). "The facts cannot make it merely

possible that the defendant is liable; they must make it plausible." *Agema v.*

*City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Iqbal*, 556 U.S. at

678); *see also Twombly*, 550 U.S. at 555–56 ("Factual allegations must be

enough to raise a right to relief above the speculative level."). "[P]lausibility occupies that wide space between possibility and probability." *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012) (internal marks omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

Whether a complaint sufficiently alleges a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). The court must view the complaint in the light most favorable to plaintiff, accept all allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor, but it "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012) (internal citations and quotation marks omitted); *see also Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 839 (6th Cir. 2024), *abrogated on*

*other grounds by McNeal v. City of Blue Ash*, 117 F.4th 887 (6th Cir. 2024).[2]

### B. Title VII Discrimination

Title VII prohibits employers from "discriminat[ing] against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).

To state an employment discrimination claim under Title VII, a plaintiff need only plead sufficient facts from which the court could plausibly conclude that defendant took adverse action against the plaintiff because of her membership in a protected class. *See Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1060–61 (6th Cir. 2022). "A complaint that includes only conclusory allegations of discriminatory intent without

---

[2] Dawson asserts that one of the exhibits the University attached to its motion should not be considered by the Court. ECF No. 19, PageID.232–33. Generally, "matters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). A court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to a motion to dismiss, provided those exhibits were either referred to in the complaint or "are central to the claims contained therein." The Court need not address this issue because it considered only the FAC's allegations in deciding the University's motion.

supporting factual allegations does not sufficiently show entitlement to relief." *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012) (referencing *Iqbal*, 555 U.S. at 680–681). Although a complaint need not present "detailed factual allegations," it must allege sufficient "factual content" from which a court, informed by its "judicial experience and common sense," could "draw the reasonable inference," that defendant intentionally discriminated against plaintiff because of her race. *See Keys*, 684 F.3d at 610 (quoting *Iqbal*, 556 U.S. at 678, 679). "If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied." *Id*. But, as the Sixth Circuit has explained, "[t]his Court is not required to accept inferences drawn by Plaintiff if those inferences are unsupported by the facts alleged in the complaint." *Han v. Univ. of Dayton*, 541 F. App'x 622, 627 (6th Cir. 2013).

The University argues that the FAC fails to plead a viable discrimination claim because it does not plausibly allege that the University terminated Dawson due to her race or gender. The Court agrees that the FAC alleges no facts beyond Dawson's own conclusions from which a

court could infer that her race or gender factored into the University's decision to terminate her.

Dawson's FAC alleges many facts to suggest that the University deviated from its standard employment and disciplinary policies with respect to her termination. Indeed, Dawson's allegations could permit an inference that the University unfairly subjected her to discipline and termination based on the antisemitic viewpoint she was believed to have expressed, treating her differently than her University colleagues accused of publicly making other bigoted or offensive remarks. But nothing other than Dawson's own conclusions support that the University took these actions against her because of her race or gender.

Dawson alleges that the University bypassed "all usual disciplinary procedures" and disregarded "the potential for a conflict of interest" by hiring a law firm which also represents the ADL, the organization accusing Dawson of making antisemitic remarks, to investigate her. ECF No. 15, PageID.123, ¶ 31. She also alleges that a regent intervened to insist on Dawson's termination after learning of the University's intent to sanction her less severely. *See id*. at PageID.128–29, ¶ ¶ 39–41. These allegations may very well assert violations of University employment policy and possibly of

Dawson's constitutional rights,[3] but they carry no suggestion that the University's violative procedures and adverse actions against her were motivated by or in any way related to her race or gender.

Dawson alleges that her supervisor believed the University was treating her unfairly and not according to University policy. The FAC includes excerpts from Dawson's supervisor's letter to the president expressing her disagreement with the investigation and its conclusion. *Id*. at PageID.125–28. But the supervisor does not link the investigation's aberration from University policy to Dawson's race or gender, instead raising "questions about equity in process and how. . .the university [is] treating and responding to different *topics* and people. . . ." *Id*. at PageID.126, ¶ 36 (emphasis added). Dawson's supervisor expresses concern that the investigation's conclusion might reflect confirmation bias and/or recall bias but never mentions racial or gender bias. *Id*. at PageID.127.

---

[3] Dawson's FAC indicates that a separate lawsuit would be filed in the Michigan Court of Claims alleging violations of her constitutional rights to free speech, equal protection, and due process, as well as violations of Michigan's Elliot-Larsen Civil Rights Act. ECF No. 15, PageID.118–19.

Only Dawson's own conclusion, expressed in the written statement she submitted in advance of her DRC, implicates race or gender as the University's motivation for its adverse action against her. In her statement, Dawson asserts that "[t]he University's characterization of my conduct as 'aggressive' or 'abusive' reflects negative stereotypes about Black women," "portray[ing] them as confrontational or untrustworthy." *Id*. at PageID.130, ¶ 51. The statement expresses Dawson's concern "that discrimination and bias may have informed the University's. . .decision to not only discipline me, but escalate my discipline from a written warning to a DRC." *Id*. But, as previously noted, courts "are not required to accept inferences drawn" by the plaintiff "if those inferences are unsupported by the facts alleged in the complaint." *Han*, 541 F. App'x at 627.

To factually support Dawson's claims of racial and gender discrimination, the FAC cites several instances in which University faculty, staff, and program board members engaged in similar or more serious conduct without discipline or termination. Dawson asserts that a non-Black member of the University community did not face disciplinary action after calling Arab and Muslim students "terrorists," "rapists," and "murderers" and that a white male urology professor accused of berating, harassing and

Page **14** of **20**

discriminating against a female Egyptian colleague and researcher did not face termination. She cites two examples of University staff members who made public racist remarks about Black people without University punishment. And finally, she references at least three instances of University faculty or staff members who made offensive comments about the death of Charlie Kirk without University discipline despite facing community pressure in favor of punishment.

First, even if these examples cited by Dawson constitute similarly situated individuals and conduct, it is far from certain that such parallels alone, without facts suggesting discriminatory intent toward Dawson, would be enough to survive a motion to dismiss. *See Meka v. Dayco Products LLC,* 742 F. Supp. 3d 769, 774 (E.D. Mich. 2024); see also *Iqbal,* 556 U.S. at 678 (alleged "facts that are merely consistent with a defendant's liability, fall short of the line between possibility and plausibility") (internal quotations omitted). Second, Dawson's factual allegations emphasize a key distinction between her conduct and that of the examples she gives, one that could very well keep Dawson's cited individuals from qualifying as comparators. Unlike any of the unpunished members of the University community

referenced in the FAC, Dawson was terminated specifically for making antisemitic comments.

This significant difference supports a more-than-plausible basis for the University's actions against Dawson that has nothing to do with race or gender. Discrimination is not a plausible inference when the facts alleged raise an "obvious alternative explanation" for the offending conduct. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567) (internal marks omitted); *see also Hussein v. Beecroft*, 782 F. App'x 437, 443 (6th Cir. 2019) (upholding dismissal of complaint where plaintiffs' nonspecific allegations of wrongdoing conflicted with another obvious explanation for defendant's inaction). The facts alleged by Dawson strongly suggest that the University's actions against Dawson were motivated specifically by the fact that she was accused of making antisemitic remarks. That other University personnel, one of whom was within one of Dawson's protected classes, were not disciplined for expressing anti-Palestinian sentiment gives rise to an inference that the University treated Dawson differently and more harshly not because of her race or gender, but due to the group her alleged remarks offended.

Page **16** of **20**

This obvious alternate explanation, coupled with only Dawson's "bare and conclusory assertions" that the University's decision-making was driven by racial and gender discrimination, does not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Han*, 541 F. App'x at 627. From the facts alleged in the FAC, this Court, informed by its "judicial experience and common sense," cannot draw a reasonable inference that the University discriminated against Dawson because of her race or gender and, thus, must dismiss Dawson's Title VII discrimination claim. *See Keys*, 684 F.3d at 610; *Iqbal*, 556 U.S. at 678.

### C. Title VII Retaliation

Title VII also prohibits employers from discriminating against an employee for engaging in conduct protected by Title VII. 42 U.S.C. § 2000e-3(a). The prima facie elements of a retaliation claim under Title VII are (1) plaintiff engaged in activity protected by Title VII; (2) the exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). To sufficiently state a claim for retaliation, a plaintiff

must allege sufficient facts to support a causal link between the claimed protected activities and the adverse employment actions. *Kinney v. McDonough*, 2022 WL 223633, at *7 (6th Cir. Jan. 26, 2022) (citing *Koutsoukos v. Adecco USA, Inc.*, 2017 WL 5514558, at *2 (6th Cir. July 14, 2017)). The facts alleged by Dawson do not support such a link.

As alleged, Dawson engaged in protected activity when she accused the University of discrimination against her as a Black woman in the written statement she submitted ahead of her DRC. See ECF No. 15, PageID.130–31, ¶ 51. But as she references in the statement, the University had already decided to escalate her discipline from a written warning to a DRC, which included the possibility of termination. *Id*. Indeed, as Dawson alleges, the University set her termination in motion after a regent, "disgusted" by what he believed to be an insufficient response to Dawson's conduct, insisted that her termination would be the only acceptable outcome. *Id*. at PageID.128–29, ¶ ¶ 39–41. The regent intervened in the University decision-making process weeks before Dawson submitted the statement in which she first asserts racial and gender discrimination. *See generally id*.

The facts alleged in the FAC strongly suggest that Dawson was terminated at the insistence of a University regent before any protected activity took place and thus do not support a conclusion that Dawson's termination was to punish her for exercising protected rights. Moreover, an employee cannot insert a claim of discrimination as a shield to existing disciplinary proceedings, nor is an employer obligated to deviate from its decided disciplinary course merely because the employee alleges discrimination. *Beard v. AAA of Michigan*, 593 F. App'x 447, 451 (6th Cir. 2014). The facts as alleged do not support a causal link between Dawson's eleventh-hour claims of race and gender discrimination and her termination and thus her Title VII retaliation claim cannot withstand the motion to dismiss.

## IV.    Conclusion

The facts alleged by Dawson suggest that the University deviated from its standard procedure for investigating employees accused of discrimination and ultimately, and perhaps unfairly, disciplined her more harshly than other personnel accused of making equally bigoted or otherwise offensive remarks. The Court believes these factual allegations could plausibly support other viable claims, such as those Dawson chose to

assert against the University in state court.  But they do not give rise to the inference that the University singled Dawson out based on her race, gender, or membership in any protected class under Title VII,[4] which are the claims asserted here. Accordingly, the Court **GRANTS** defendant's motion to dismiss Dawson's Title VII claims (ECF No. 17).

s/ Shalina D. Kumar
SHALINA D. KUMAR

Dated: July 28, 2026                         United States District Judge

---

[4] Unfortunately for Dawson, speakers—alleged or confirmed—of antisemitic remarks is not a protected class under Title VII.